MOSK, J.
I concur in the majority opinion. I write separately to disagree with the views expressed in Justice Brown’s concurring opinion. Although no measure adopted by the Legislature so provides, the concurring opinion advocates a brand of judicial lawmaking by declaring that punitive damages must not, absent some special, unspecified showing, exceed actual damages by more than three times. Such a rule cannot be justified.
*417 I.
“The purpose of punitive damages is to punish wrongdoers and thereby deter the commission of wrongful acts.” (Neal v. Farmers Ins. Exchange (1978) 21 Cal.3d 910, 928, fn. 13 [148 Cal.Rptr. 389, 582 P.2d 980] (Neal).) In Neal, we set forth three factors relevant to the assessment of punitive damages: (1) the degree of reprehensibility of the act; (2) the amount of compensatory damages awarded; and (3) the wealth of the particular defendant. (Neal, supra, 21 Cal.3d at p. 928.) The concurring opinion proposes to fix a “soft” ceiling on punitive damages by using only one of the three Neal factors—the amount of compensatory damages. But the primary purpose of compensatory damages is fundamentally different from punitive damages—to make plaintiffs whole, not to deter future harm. There is simply no reason why punitive damages should be limited by some fixed ratio to actual damages.
What the United States Supreme Court stated in the context of a due process analysis of punitive damages is directly relevant here: “[W]e have consistently rejected the notion that the constitutional line [for limiting punitive damages] is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. [Citation.] Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.” (BMW of North America, Inc. v. Gore (1996) 517 U.S. 559, 582 [116 S.Ct. 1589, 1602, 134 L.Ed.2d 809], fn. and italics omitted.) Given that the “simple mathematical formula” has been rejected in the constitutional context because it is illogical, and given that no such formula has been dictated by statute, it is difficult, to say the least, to see why we should impose the rule by judicial fiat, as the concurring opinion proposes.
Our case law reveals a number of instances of intentionally harmful conduct in which only nominal actual damages were awarded because such damages were difficult to quantify, but in which punitive damages hundreds or thousands of times greater were assessed. (See, e.g., Werschkull v. United California Bank (1978) 85 Cal.App.3d 981 [149 Cal.Rptr. 829] [$1 of actual damages and $550,000 in punitive damages for trustee’s breach of fiduciary duty]; Contento v. Mitchell (1972) 28 Cal.App.3d 356 [104 Cal.Rptr. 591] [no damages in slander case but $3,000 in punitive damages]; Sterling Drug v. Benatar (1950) 99 Cal.App.2d 393 [221 P.2d 965] [$1 nominal damages and $200 punitive damages for violation of Fair Trade Act]; Clark v. McClurg (1932) 215 Cal. 279 [9 P.2d 505, 81 A.L.R. 908] [same, $0 to *418 $5,000 ratio].) In these cases, the seriousness of the defendant’s misconduct was more important than actual damages in gauging the appropriate amount of the punitive damages award. Indeed, this court has emphasized that none of the three Neal factors can be dispensed with in calculating punitive damages awards. (Adams v. Murakami (1991) 54 Cal.3d 105, 111 [284 Cal.Rptr. 318, 813 P.2d 1348].)
To put the matter in other terms, the concurring opinion would flatten out the variability of punitive damage awards by deemphasizing two important factors used to determine such damages: the extent of the defendant’s misconduct and its wealth. As such, the worse the defendant’s misconduct, and the greater its wealth, the more it stands to benefit from the concurring opinion’s proposed damages limitation.
There appears to be a consensus among researchers that, media perceptions notwithstanding, large and disproportionate punitive damage awards are not a problem in our judicial system in any significant degree—there is no punitive damages crisis. (See Rustad, Unraveling Punitive Damages: Current Data and Further Inquiry (1998) Wis. L.Rev. 15, 54-55.) The concurring opinion concedes as much. (Conc. opn. of Brown, J., post, at pp. 428-429.) Nor are punitive damages a problem in this case, once the proper standard for granting a new trial is enforced. Why does the concurring opinion propose to judicially reform punitive damages? The principal reason given is that such damages are awarded by juries in an arbitrary fashion. But it concedes that the very commentators who criticize punitive damages for their arbitrariness have also criticized reforms like that proposed by the concurring opinion as being at odds with punitive damages’ central purpose of deterring wrongful conduct. (See Sunstein et al., Assessing Punitive Damages (with Notes on Cognition and Valuation in Law) (1998) 107 Yale L.J. 2071, 2127 [“no theory of punitive damages justifies a [compensatory damages] multiplier approach”].)
Nor is there any indication, as the concurring opinion suggests, that large compensatory damages awards render substantial punitive damages awards unnecessary. On the contrary, commentators have pointed out that punitive damages may partially remedy the systematic undercompensation of plaintiffs in the tort system. (See Saks, Do We Really Know Anything About the Behavior of the Tort Litigation System—and Why Not? (1992) 140 U. Pa. L.Rev. 1147, 1220-1221.)
While acknowledging that large, undeserved punitive damages awards are not a common occurrence, the concurring opinion finds fault with our current punitive damage system in part because “it distorts settlements by adding disproportionate leverage to a plaintiff’s demands . . . .” (Conc. *419 opn. of Brown, J., post, at p. 428.) But it cites no evidence, and there is no indication, that this supposed “disproportionate leverage” on the part of tort or employment discrimination plaintiffs is a problem. On the contrary, there is evidence that plaintiffs are often at a considerable economic disadvantage, particularly individuals suing large corporate entities. (See Cady, Disadvantaging the Disadvantaged: The Discriminatory Effects of Punitive Damages Caps (1997) 25 Hofstra L.Rev. 1005, 1011.)
II.
Aside from this generalized attack on punitive damages, the concurring opinion must answer two questions to justify its position: (1) why choose compensatory damages as the measure of punitive damages? and (2) why three times actual damages? In order to answer both these questions, the concurring opinion cites a number of statutes in which the Legislature has provided for double or treble damages as part of a statutory scheme. It concludes: “The statutory web anchors two observations. First, the Legislature has selected compensatory damages as the best, albeit imperfect, metric for calibrating the punitive component of a damages award. Second, the Legislature has determined that double or treble damages are, in most circumstances, sufficiently punitive.” (Conc. opn. of Brown, J., post, at p. 426.)
I disagree with both “observations.” The Legislature has in many statutes provided for punitive damages without double or treble limitation, or in fact any limitation. Of course, Civil Code section 3294, the statute generally authorizing punitive damages in noncontract cases, is the most significant example of such a statute. But there are many others as well. (See, e.g., Bus. & Prof. Code, § 14340 [punitive damages authorized for seizure of non-counterfeit goods]; Civ. Code, § 1708.7, subd. (c) [punitive damages for tort of stalking]; id., § 1780, subd. (a)(4) [punitive damages under the Consumer Legal Remedies Act]; id., § 1786.50, subd. (b) [punitive damages for willful violation of Investigative Consumer Reporting Agencies Act]; id., § 1789.21, subd. (a) [punitive damages for violation of Credit Services Act].) Moreover, there are other statutes where punitive damages are authorized, but with a numerical cap. (See, e.g., id., § 1785.31 [punitive damages of not more than $5,000 for violations of Consumer Credit Reporting Agencies Act]; id., § 1788.30 [punitive damages of up to $1,000 for unlawful debt collection].) Yet other statutes specify that no punitive damages are to be awarded. (See, e.g., Bus. & Prof. Code, § 17550.51 [Travel Consumers Restitution Corporation not liable for punitive damages].) Indeed, my research reveals that there are over 150 California statutes that address punitive or exemplary damages. Taking the concurring opinion’s figure that *420 double and treble damages are used in “more than 30 instances” (conc. opn. of Brown, J., post, at p. 425), we must conclude that the Legislature has used double or treble damages as a limit on punitive damages in a small minority of the statutes in which it has chosen to address punitive damages.
Thus, the generalization that “the Legislature has selected compensatory damages as the best. . . metric for calibrating the punitive component of a damages award” (conc. opn. of Brown, J., post, at p. 426) is simply inaccurate. Rather, all we can safely generalize, after observing the entire patchwork of punitive damages statutes, is that the Legislature has enacted a number of statutes containing a variety of responses to punitive damages, some providing double damages, some treble damages, some providing monetary caps, some prohibiting punitive damages altogether, and many statutes permitting punitive damages without limitation. The unmistakable inference to be drawn from this patchwork is that the Legislature knew how to limit punitive damages as a multiple of compensatory damages, and in many instances, including the statute broadest in scope, Civil Code section 3294, declined to do so. (See People v. Birkett (1999) 21 Cal.4th 226, 233-234 [87 Cal.Rptr.2d 205, 980 P.2d 912].) Given that inference, by what right may this court second-guess the Legislature and import a damages limitation, even a “soft” limitation, when the Legislature has deliberately declined to impose one? By what right may we arbitrarily prefer treble damages to the other statutory methods of dealing with punitive damages? Indeed, the concurring opinion’s citation of a number of states that have chosen, by statute, a double or treble damages limitation (see conc. opn. of Brown, J., post, at p. 426, citing BMW of North America, Inc. v. Gore, supra, 517 U.S. at pp. 614-616 [116 S.Ct. at pp. 1618-1619] (appen. to dis. opn. of Ginsburg, J.)), only serves to underscore the essentially legislative nature of the reform it is proposing.
There may indeed be some validity to the cautious extension of statutory rules into areas of common law. This was the method advocated by Chief Justice Traynor in his article, Statutes Revolving in Common Law Orbit (1968) 17 Cath. U. L.Rev. 401. A classic example is the use of penal statutes to establish standards of care for purposes of tort liability in instances in which a penal statute does not technically apply. (Id., at pp. 415-417.) A similar method was employed in Moragne v. States Marine Lines (1970) 398 U.S. 375, 390 [90 S.Ct. 1772, 1782, 26 L.Ed.2d 339], cited by the concurring opinion, in which the United States Supreme Court overruled an outdated common law admiralty doctrine disallowing wrongful death actions after acknowledging the universal legislative recognition of such actions. But granting the validity of Chief Justice Traynor’s method, and indeed even putting aside the problematic fact that we are engaging not in creation of common law but in statutory construction, this method is not correctly *421 applied by the concurring opinion. The success of the method depends on a unified, coherent expression of legislative policy embodied in a statute or statutues from which a common law rule can be derived. But as discussed above, there is no unified, coherent legislative policy regarding punitive damages, and certainly treble damages does not represent such a policy. The concurring opinion’s proposal is therefore nothing more than the arbitrary imposition of a soft numerical limitation on punitive damages. Legislatures can impose such numerical limitations.[1] Courts cannot.[2]
The Legislature has, to be sure, delegated to the courts the task of reviewing damages awards and determining when they are “excessive” under Code of Civil Procedure section 657, and this includes punitive damages. Our previous attempts to define the factors to be considered in determining whether an award is excessive were fully consistent with this review function, and with punitive damages’ primary purpose of deterring wrongful conduct. (See Neal, supra, 21 Cal.3d at p. 928.) The constitutional constraints on punitive damages articulated by the United States Supreme Court provide further guidance for lower courts. (See BMW of North America, Inc. v. Gore, supra, 517 U.S. 559.) There is no reason to suppose that judicial review of punitive damages awards following Neal and BMW is not working adequately to restrain excess punitive damages. But even if courts require still further guidance, the arbitrary judicial imposition of a ceiling on punitive damages of no more than three times actual damages is not the answer, for all the reasons explained above.

In characterizing the numerical limitation of punitive damages as a legislative task, I express no opinion as to whether there are any state constitutional limits on punitive damages reform. (See State ex rel. OATL v. Sheward (1999) 86 Ohio St.3d 451 [715 N.E.2d 1062].)

The concurring opinion implies that I view the judicial function as a passive one. I do not. Judicial innovation in areas of law not governed by Constitution, statute, or regulation is vital to our common law tradition. Judges working in that tradition must adapt venerable principles and doctrines to meet new needs. (See, e.g., Sindell v. Abbott laboratories (1980) 26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924, 2 A.L.R.4th 1061] [holding that persons unable to identify a particular drug manufacturer that injured them may jointly sue all manufacturers of the drug on an enterprise liability theory].) The imposition of numerical caps on damages, however, is an essentially legislative function.